## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| CORD FORWARDERS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:04-CV-1551 CAS |
| | ) | |
| RYDER TRUCK RENTAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

This matter is before the Court following a four-day bench trial. Having considered the pleadings, trial testimony and exhibits, the Court hereby makes and enters the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

Plaintiff Cord Forwarders, Inc., ("Cord") is a Missouri corporation located in Earth City, Missouri, whose business is to provide its customers with over the road trucking services to haul the customers' product/freight from one location to another. Cord was initially formed to haul freight for Triad Manufacturing. Defendant Ryder Truck Rental, Inc., ("Ryder") is a Florida corporation which maintains business locations across the country, including St. Louis County, Missouri, whose business operations include, but are not limited to, leasing tractors and trailers to others who in turn may utilize such equipment to transport product/freight in intrastate and interstate commerce.

In early 2001 Ryder was leasing its tractors and trailers to Oklahoma Van Lines, LLC. ("OVL") and Show Me Express, Inc., ("Show Me"). OVL and Show Me were experiencing business and/or financial difficulties and wanted to terminate their equipment obligations with Ryder. Negotiations ensued between Cord, Ryder, Show Me and OVL whereby Cord would enter into

assignments to operate the OVL Equipment and the Show Me Equipment. As a result of these negotiations Cord believed it had an agreement with Ryder that if Cord executed the assignments and operated the OVL Equipment all of the OVL Equipment would be subject to a July 1, 2002 termination date with no turn-in penalty and that if Cord operated the Show Me Equipment it could turn in the Show Me Equipment if Cord experienced a substantial business downturn. In May 2001 Cord executed the assignments and began to operate the OVL Equipment and the Show Me Equipment. Prior to and on July 1, 2002 Cord attempted to terminate its obligations to Ryder relative to the OVL Equipment. Ryder refused to recognize a July 1, 2002 termination date with no turn-in penalty. Due to circumstances then existing Cord was forced to continue the use of the OVL Equipment until lease termination.

In January 2004 Cord notified Ryder that it had experienced a substantial business downturn and would be terminating its obligations relative to the Show Me Equipment. Ryder refused to recognize Cord's right to terminate based on a substantial business downturn. Due to circumstances then existing Cord continued the use of the Show Me Equipment until lease termination.[1]

In its six-count Petition, Cord alleges that Ryder violated its agreements with Cord by failing to honor a July 1, 2002 termination date with no turn-in penalty for the OVL Equipment and by failing to honor termination of the Show Me Equipment obligations based upon a substantial business downturn. Ryder denies it had an agreement with Cord for a July 1, 2002 termination date with no turn-in penalty for the OVL Equipment and denies that Cord experienced a substantial business downturn allowing for the turn-in of the Show Me Equipment. In counts I and II, which are now

---

[1] It was Cord's plan to turn in the Show Me Equipment on March 24, 2004 and purchase equipment to replace the Show Me Equipment.

moot, Cord seeks a declaratory judgment.[2]   In the remaining counts, Cord asserts claims for fraudulent inducement, negligent misrepresentation, and breach of contract.

## FINDINGS OF FACT

1.     Plaintiff Cord Forwarders, Inc., ("Cord") is a Missouri corporation which maintains its principal place of business in the County of St. Louis, State of Missouri.  Cord's business is to provide its customers with over the road trucking services to haul the customers' product/freight from one location to another.

2.     Defendant Ryder Truck Rental, Inc., ("Ryder") is a Florida corporation with a branch office located in the County of St. Louis, State of Missouri.   Ryder's business operations include, but are not limited to, leasing tractors and trailers to its customers who in turn utilize such equipment to haul product/freight from one location to another.

3.   Ryder and nonparty Show Me Express, Inc. ("Show Me") were parties to a Truck Lease and Service Agreement ("Show Me Master Lease") dated December 4, 1998, and a series of vehicle leases identified by separate Schedule A agreements (the "Show Me Leases").  (Pltf. Trial Ex. 1, 2).

4.   Ryder and nonparty Oklahoma Van Lines, LLC ("OVL") were parties to a Truck Lease and Service Agreement ("OVL Master Lease") dated April 12, 2000 and a series of vehicle leases identified by separate Schedule A agreements (the "OVL Leases").  (Pltf. Trial Ex. 4, 5).

---

[2]In count I, Cord seeks a determination by the Court regarding the right of Cord to turn in the OVL Equipment on July 1, 2002 based on the agreement reached and reflected by Mr. Noel's April 25, 2001 email.  Cord has styled and pled count I as seeking relief by way of a declaratory judgment.  Cord is seeking a determination by the Court to allow it to turn in the OVL Equipment based on Mr. Noel's April 25, 2001 email.  However, at the time of trial Cord no longer operated or possessed any of the OVL Equipment.  Since there is no OVL Equipment for Cord to turn into Ryder, count I is moot.  Count II seeks similar relief relating to the Show Me Equipment and for the same reason is also moot.

5.   In early 2001 OVL was interested in terminating its tractor and trailer leasing relationship with Ryder as OVL was in the process of discontinuing its own transportation fleet with plans to turn in the OVL Equipment to Ryder.  (Tr. I at 36, 37, 88, 89, 98; Pltf. Trial Ex. 22).

6.   In early 2001 Show Me had lost a major source of its business revenues to which it had dedicated the equipment it leased from Ryder and therefore was contemplating bankruptcy and planning to turn in the Show Me Equipment to Ryder.  (Tr. I at  34, 35, 98).

7.   In 2001 Craig Noel was employed by Ryder in the capacity of customer development manager in St. Louis and Mr. Noel was the account manager for Ryder's Show Me account.  (Tr. II at 132).

8.   In March 2001, Steve Ryan, President of Cord, began exploring the possibility of taking over the OVL Equipment and Show Me Equipment from OVL and Show Me.  (Tr. I at 38 - 40, 89 - 94).  Cord's purpose for taking over this equipment was to capture the freight business and revenues from Triad Manufacturing, i.e., revenues generated from Triad Manufacturing freight hauling business through the use of the OVL Equipment and Show Me Equipment.  (Tr. I at 38, 50, 90, 91).

9.   Prior to Mr. Ryan speaking with Mr. Noel about the OVL Equipment and Show Me Equipment, Rick Palo, an owner of Show Me who later became an owner of Cord, informed Mr. Noel that Show Me had the intention of filing bankruptcy and that OVL was in the same shape and Mr. Palo and/or Mr. Noel indicated Ryder was aware of these issues.  (Tr. I at 41; Tr. II at 146, 147).

10.  Mr. Noel stated that if a trucking firm goes out of business, or outsourced its work and it has long term leases with Ryder, the equipment at issue will be returned to Ryder.  (Tr. II at 148).

11.  At Mr. Ryan's request Mr. Palo requested and received from Mr. Noel leases and documents regarding the OVL Equipment and the Show Me Equipment.  (Tr. I at 42, 94 - 96).

12.  After obtaining the documents from Mr. Noel, Mr. Ryan and Mr. Palo met with Mr. Noel

at Ryder's business location in St. Louis County to review the options between Cord and Ryder. (Tr. I at 43, 96, 97).

13. At the meeting Mr. Ryan explained to Mr. Noel that before Cord would consider the use of the OVL Equipment or the Show Me Equipment, Cord needed a consolidated termination date for the OVL equipment whereby Cord could turn-in the OVL Equipment to Ryder with lease obligations terminating. Mr. Noel acknowledged this issue was discussed, stating the OVL Equipment obligations would "term out at the same time." (Tr. I at 45 - 47, 98 - 101; Tr. II at 134, 135).

14. Mr. Palo stated without the consolidated termination date "then there would be no deal" and Mr. Ryan stated that without a consolidated termination date he "would not have gone forward." (Tr. I at 47, 99, 100).

15. Mr. Noel stated at the meeting he would check into Mr. Ryan's request regarding a consolidated termination date and get back to him. (Tr. I at 47, 100).

16. Mr. Ryan told Mr. Noel to follow up with Steve Patterson, Cord's Chief Financial Officer. (Tr. I at 95, 101).

17. After the meeting Mr. Ryan told Mr. Patterson that there would be a common date to turn in the OVL Equipment of July 1, 2002 with no penalties and no conditions, and Mr. Ryan instructed Mr. Patterson to get it in writing and work out the final details with Ryder. (Tr. II at 15, 16). 18. Mr. Patterson had several conversations and voicemails with Mr. Noel, as well as a meeting during which it was agreed Cord would be allowed to turn in the OVL Equipment on July 1, 2002 with no penalties or conditions. (Tr. II at 16, 17).

19. On April 25, 2001, Mr. Noel sent an email to Mr. Patterson which read, in pertinent part:

"I received a verbal agreement from my area finance director approving the

consolidation of the "Early Termination" of the OK Van Lines Equipment if the assignment to Cord Moving & Storage is executed. The consolidated date for the equipment will be 7/1/02. . . . It is Ryder's hope that you will continue to have a need and realise [sic] the benefits of running the vehicles to the end of the original term, but if need, with at least 60 days written notice of intent to do so, Cord will have the right to turn in the equipment after 2002.  There is no penalty, but please read the termination language on the Schedule A's since as in all of our termination language you would be responsible for any un-expired licensing, physical damage repairs, and de-identification cost. . . ." (Pltf. Trial Ex. 7).

20.  When Mr. Ryan read Mr. Noel's email he believed it was Cord's agreement with Ryder "put into words."  (Tr. I at 106).

21.  Based on the communications with Mr. Noel, Mr. Ryan believed the "no penalty" language contained in the email meant that the OVL Equipment could be turned in on the termination date with "no penalties, no issues," just "shake hands and part ways."  (Tr. I at 107, 108).

22.  Mr. Noel stated he believed that the Show Me Leases contained a penalty provision.  (Tr. II at 148, 149, 168).

23.  Mr. Noel believed the term "penalty," as he used it in the April 25, 2001 email, described "a decelerating penalty" similar to what was contained in the Show Me Leases, which Mr. Noel explained as follows:

> "Well you know, it says in here, if they, you know, exercise the early termination, during the first year they'd pay $7,000.00; second year, 65.  So there is a penalty associated with that .  There is no penalty associated with the Oklahoma Van Lines stuff, it's just they got to meet the conditions and there's no penalty to get out early."

(Tr. II at 139, 140).

24.  The penalty provision in the Show Me Leases--as referenced by Mr. Noel as being a penalty--specifically states that "You and Ryder agree that the early termination fee is in the nature of liquidated damages and *is not a penalty*."  **(emphasis added)**  (Pltf. Trial Ex. 2)

25. Cord relied on the agreement with Ryder as memorialized in Mr. Noel's April 25, 2001 email that Cord could turn in the OVL Equipment on July 1, 2002 with no penalty in moving forward with the assignments for the OVL Equipment and the Show Me Equipment. (Tr. I at 113 - 115; Tr. II at 21).

26. Prior to executing the assignments for the OVL Equipment and the Show Me Equipment Mr. Palo and Mr. Ryan formed Cord to handle the Triad Manufacturing freight hauling business which was anticipated to generate between two and three million dollars of revenue per year. (Tr. I at 49 - 52).

27. On May 15, 2001, Cord executed a document titled "Assignment (TLSA)" whereby Cord took over the OVL Equipment. The OVL "Assignment (TLSA)" refers to a Master Lease Agreement dated June 30, 1997.[3] (Pltf. Trial Ex. 6).

28. On May 25, 2001 Cord executed a document titled "Assignment (TLSA)" whereby Cord took over the Show Me Equipment. (Pltf. Trial Ex. 3).

29. The Master Lease Agreements, Schedule A's and assignments were documents drafted by Ryder. (Tr. I at 115; Tr. II at 166; Pltf. Trial Ex. 1, 2, 4, 5).

30. In correspondence dated February 8, 2002, March 15, 2002, and June 26, 2002, Cord advised Ryder that it was exercising its right to turn in the OVL Equipment on July 1, 2002 based on the agreement memorialized by the April 25, 2001 Craig Noel email. (Pltf. Trial Ex. 8, 9, 12).

31. In correspondence dated February 20, 2002, Ryder informed Cord that pursuant to the language in the OVL Leases Cord could only cancel the OVL Leases by purchasing the OVL Equipment unless Cord "no longer operates a private fleet." (Pltf. Trial Ex. 10).

---

[3] A master lease dated June 30, 1997 was never entered into evidence.

32. The OVL Leases contained a provision allowing for termination with no turn in penalty if you no longer operated your own transportation fleet which reads in substantial part as follows:

> "Termination Business Issue: If your business changes in such a manner that you no longer operate your own transportation fleet, you may terminate the vehicles lease on the vehicles listed on this Schedule A (the Scheduled Vehicles) . . . ."

(Pltf. Trial Ex. 5)

33. At no time did Cord operate a private fleet as Cord was a for-hire carrier. (Tr. II at 174 - 176; Tr. III at 8).

34. The parties attorneys exchanged communications between February 26, 2002 and July 1, 2002, setting out their respective clients' positions. (Pltf. Trial Ex. 11, 13, 40).

35. On July 1, 2002, due to financial and other considerations, Cord decided to retain the OVL Equipment and continue to negotiate with Ryder to accept the OVL Equipment without penalties or conditions. (Tr. II at 30).

36. Mr. Patterson determined that if Cord had turned in the OVL Equipment on July 1, 2002 and replaced it with purchased equipment Cord would have realized a profit/savings of $260,001.09. (Tr. II at 32; Pltf. Trial Ex. 29 - 33, 35 - 39).

37. The Show Me Leases contained a provision allowing for an early turn-in of the Show Me Equipment for "a substantial business downturn" which reads in substantial part as follows:

> "It is mutually agreed that Customer may terminate the lease on listed vehicle, if customer experiences a substantial business downturn, that results in a corresponding reduction in freight transported, by giving Ryder (60) days written notice of their intent to do so."

(Pltf. Trial Ex. 2).

38. The term "substantial business downturn" is not defined, and Ryder has no document wherein "substantial business downturn" is defined. (Tr. II at 151; Tr. III at 68, 69; Pltf. Trial Ex.

2).

39. At the time Cord executed the assignments Cord expected revenues from the OVL and Show Me related business of approximately two and a half million dollars. In 2001 Cord actually had 2.1 million in revenues. In 2002 the revenues were 1.1 million. In 2003 there was a slight increase in revenues to 1.25 million. However, 2003 fourth quarter revenues decreased by 39% over 2002 fourth quarter revenues. (Tr. II at 58 - 62; Pltf. Trial Ex. 25).

40. As a result of the revenue figures, with an emphasis on the 2003 fourth quarter decrease, Cord felt it had a substantial business downturn and needed to exercise its option to turn in the Show Me Equipment. (Tr. II at 62, 63).

41. In January 2004 Cord instructed its legal counsel to notify Ryder of a substantial business downturn and provide the sixty (60) days advance notice of the turn-in of the Show Me Equipment with a turn-in date of March 24, 2004. (Tr. II at 57; Pltf. Trial Ex. 19).

42. Ryder refused to recognize Cord's right to turn-in the Show Me Equipment based on a substantial business downturn because Ryder claimed Cord was in default. (Tr. II at 63, 64).

43. Between January 22, 2004 and March 24, 2004 Ryder told Cord that Cord was in default. (Tr. II at 63, 64, 69).

44. Cord was not in default with Ryder after January 13, 2004. (Tr. I at 58; Tr. II at 69, 70; Tr. III at 67; Pltf. Trial Ex. 18).[4]

45. Ryder never requested from Cord any documentation or evidence which would support a substantial business downturn that resulted in a corresponding reduction in freight transported or

[4] While Ryder sent a notice to Cord dated March 17, 2004 stating that Cord was in default (Pltf. Trial Ex. 21), Mr. Wilson, general manager of Ryder's St. Louis office, testified that Cord was not in default as of March 9, 2004 (Tr. III at 22, 67) and based on Ryder's internal email chain dated March 15, 2004 (Pltf. Trial Ex. 42) the March 17, 2004 notice of default is not credible.

the tender of any termination fees. Ryder did not provide Cord with any type of communication requesting documentation of a business downturn or payment of a termination fee. (Tr. II at 66; Tr. III at 63, 64).

46. Mr. Patterson determined that if Cord had turned in the Show Me Equipment on March 24, 2004 and replaced it with purchased equipment Cord would have realized a profit/savings of $35,439.09. (Tr. II at 70 - 72; Pltf. Trial Ex. 29, 31, 34 - 39).

47. Mr. Patterson did not take into consideration the personal property taxes, sales taxes, and unused licensing associated with turning in the Show Me Equipment on March 24, 2004 which would have amounted to $18,159.00. (Tr. III at 95, 96).

## CONCLUSIONS OF LAW

In count V Cord alleges Ryder breached its agreements with Cord by failing to allow the turn-in of the OVL Equipment on July 1, 2002 with no penalty and by refusing to allow the turn-in of the Show Me Equipment based on a substantial business downturn. In order to prevail on a cause of action for breach of contract Cord must prove the following: 1) the existence of an enforceable contract, 2) mutual obligations arising under the terms of the contract, 3) Ryder did not perform, and 4) damages directly resulting from the breach. See, Rice v. West End Motors Co., 905 S.W.2d 541, 542 (Mo. Ct. App. 1995). The Court will address the OVL Equipment breach and the Show Me Equipment breach separately, noting that contract ambiguities are construed against the drafter. See, Triarch Indus.Inc., v. Crabtree, 158 S.W.3d 772, 776 (Mo. banc 2005).

**OVL Equipment**

There is substantial evidence to support Cord's claim that Ryder breached its agreement relative to the OVL Equipment. It is undisputed that Cord and Ryder reached an agreement whereby

Cord would execute an assignment and operate the OVL Equipment in exchange for Ryder agreeing to allow Cord to turn-in the OVL Equipment on July 1, 2002 with no penalty with at least sixty (60) days advance notice. This agreement was memorialized by Mr. Noel's April 25, 2001 email. This Court has previously found that "no penalty" included no obligation to pay a fee associated with the value of the OVL Equipment upon turn-in. Furthermore, Mr. Noel's failure to define "penalty" or include in the April 25, 2001 email any reference to an obligation to pay a fee associated with the value of the OVL Equipment upon a July 1, 2002 turn-in requires this Court to find "no penalty" means no obligation to pay a fee associated with the value of the OVL Equipment upon turn-in. There is no dispute that Cord did execute the assignment and operate the OVL Equipment and did provide Ryder with more than sixty (60) days advance notice of Cord's intention to turn-in the OVL Equipment on July 1, 2002. Ryder's insistence that Cord pay a fee associated with the value of the OVL Equipment if Cord turned-in the OVL Equipment on July 1, 2002 was a breach of the agreement existing between Cord and Ryder.

It is Ryder's position that pursuant to the express language in the OVL Leases, Cord could only turn-in the OVL Equipment on July 1, 2002 without paying the fee associated with the value of the OVL Equipment if Cord "no longer operated its own transportation fleet." By Ryder's own testimony the meaning of "no longer operated its own transportation fleet" is ambiguous. In Ryder's February 20, 2002 correspondence, Mr. Potthoff defines this condition as no longer "operates a private fleet." (Pltf. Trial Ex. 10.) Mr. Noel indicated that this condition could be interpreted so as not to include a fleet for hire. (Tr. III at 8.) The evidence established that Cord operated a fleet for hire. Given the uncertainty associated with the meaning of this condition, the Court finds that this condition does not operate as a condition precedent associated with the turn-in of the OVL

Equipment.

Cord presented evidence that it was damaged as a direct result of Ryder's breach of contract. Steve Patterson, Cord's Vice President of Finance, provided evidence in support of Cord's claim for damages. Mr. Patterson is an officer of Cord and its comptroller whose duties include all financial matters of Cord. "A lay witness' testimony in the form of opinions or inferences need only be rationally based on perception and helpful to a determination of a fact in issue. Personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for lay opinion testimony." (citations omitted) See, Burlington Northern R.R. Co. v. State of Nebraska, 802 F.2d 994, 1004-1005 (8th Cir. 1986). See also, Rule 701, Advisory Committee Notes, 2000 Amendments ("most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert."); Bbserco v. Metrix Co., 324 F.3d 955, 965-966 (8th Cir. 2003) (company owner, based on thirteen years industry experience, could testify as to company's lost profits); Eckelkamp v. Beste, 315 F.3d 863, 872 (8th Cir. 2002) (portions of accountant's affidavit allowed as lay testimony under Rule 701); Allied Systems, LTD., v. Teamsters Local 604, 304 F.3d 785, 792 (8th Cir. 2002) (company officer authorized to testify as to damages under Rule 701).

The Court concludes Mr. Patterson was qualified to testify as to Cord's damages. Patterson's testimony provided an explanation of Cord's damages supported by extensive factual information and was not based on speculative assumptions. The Court finds Mr. Patterson's testimony regarding lost profits is trustworthy and credible. Cf. Norton v. Caremark, Inc., 20 F.3d 330, 340 (8th Cir. 1994) (even if damage calculations were flawed it must be apparent that the damage calculations were so

'fundamentally unsupported' that it 'offered no assistance to the jury' before admission is improper.)

The Court recognizes that lost profit damages are sometime uncertain. However, it is the uncertainty as to the nature of the damages, not the extent of the damages, that controls whether lost profit evidence is speculative. <u>See</u>, <u>Denton Constr. Co. v. Missouri State Highway Comm'n</u>, 454 S.W.2d 44, 56 (Mo. 1970); <u>See also</u>, <u>Gasser v. John Knox Village</u>, 761 SW2d 728, 731 (Mo. Ct. App. 1988) ("Where the damages are in the nature of lost profits, all that can be required is to produce all the relevant facts tending to show the extent of the damages and one is not excused for a breach of contract resulting in damages simply because those damages may not be established with certainty.") There is substantial evidence to support Cord's claim that it lost profits as a direct and proximate result of Ryder's breach of contract. Furthermore, the substantial evidence supports a finding that Cord was damaged in the sum of $260,001.09 as a result of Ryder's breach of contract relative to the OVL Equipment.

**Show Me Equipment**

As to the claim for breach of contract relative to the Show Me Equipment, there is substantial evidence to support Cord's claim that Ryder breached its agreement by refusing to allow Cord to turn-in the Show Me Equipment on March 24, 2004 as a result of a substantial business downturn. Ryder does not define what constitutes a substantial business downturn and has no internal documents that would define a substantial business downturn. Cord presented considerable evidence of a substantial business downturn associated with its decline in the Triad Manufacturing revenues of over one million dollars (a more then 50% decrease) from 2001 through 2003. Cord properly notified Ryder of its intention to turn in the Show Me Equipment and Ryder refused to accept the notification

on the contrived premise that Cord was in default. At no time did Ryder demand confirmation from Cord of a substantial business downturn, nor did it demand payment of a termination fee. Ryder's refusal to allow Cord to turn in the Show Me Equipment on March 24, 2004 was a breach of contract. There is substantial evidence to support Cord's claim that it lost profits as a direct and proximate result of Ryder's breach of contract. Furthermore, the substantial evidence supports a finding that Cord was damaged in the sum of $17,280.09 ($35,439.09 - $18,159.00) as a result of Ryder's breach of contract relative to the Show Me Equipment.

Based on the Court's findings in reference to count V for breach of contract, the Court need not address the remaining counts claims for fraudulent inducement (count III) and for negligent misrepresentation (counts IV and VI).

**Attorney's Fees**

Ryder urges the Court to award attorneys' fees based upon contract provisions contained in the OVL Master Lease dated April 12, 2000 and the Show Me Master Lease dated December 4, 1998. Both contracts upon which Ryder relies for its claim of attorneys' fees contain similar language as follows:

> "If Ryder *takes any action to enforce any of Ryder's rights* under this Agreement or to collect amounts owed to Ryder by you, you agree to pay all of Ryder's costs and expenses in doing so." (emphasis added) **(Pltf. Trial Ex. 1, 4)**

Disregarding the Court's finding that Cord is not bound by such terms of either master lease, Ryder is simply not entitled to attorneys' fees as a matter of law. When a party claims attorneys' fees based on a contract the court cannot go beyond the contract and must adhere to the specific terms of the contract. <u>Trimble v. Pracna</u>, 167 S.W.3d 706, 714 (Mo. banc 2005) "The purpose of contract

construction is to ascertain the intent of the parties and to give effect to that intent, which is determined based on the contract alone unless the contract is ambiguous." Id.

Based on the specific contract provisions Ryder must take action to enforce its rights in order to be entitled to attorneys' fees. The defense of this matter is not a situation of Ryder enforcing its rights under the contract. The word "enforce," as defined by Blacks Law Dictionary is "to put in execution." The term "enforce any of Ryder's rights" therefore contemplates Ryder bringing an action to cause Cord to do something it is contractually bound to do. This does not include Ryder defending an action brought by Cord. In this action there was no evidence that Cord breached any of its obligations to Ryder.

Ryder's attempt to enforce contract terms at issue herein fails as the terms sought to be enforced are ambiguous. "A contract is ambiguous if its terms are susceptible of more that one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms." Trimble, 167 S.W.3d at 714. The contracts at issue are boilerplate agreements drafted by Ryder. "Where a contract is fairly open to two or more interpretations, it will be construed against the party who prepared the contract." Id. Since Ryder drafted the contracts it claims supports its defenses, and since the contract terms are ambiguous as to meaning, as a matter of law Ryder cannot enforce the contract terms.

Finally, Ryder seeks to enforce certain terms contained in the master lease agreements and/or the Schedule As, including the attorneys' fee provision. A party to a contract cannot claim a contract's benefits if it is the first to materially violate the contract. See, Boten v. Brecklein, 452 S.W.2d 86, 92 (Mo. 1970); Campbell v. Shaw, 947 S.W.2d 128, 131, 132 (Mo. App. 1997). Ryder's refusal to accept the OVL Equipment on July 1, 2002 without penalty was a material breach of the

parties agreement and operates to prohibit Ryder from enforcing contract terms.

For all of the foregoing reasons the Court will enter judgment in favor of Cord and against Ryder for the sum of $277,281.18 representing $260,001.09 relative to the OVL Equipment claims and $17,280.09 relative to the Show Me Equipment claims.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this <u>19th </u>day of September, 2006.